UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ANTHONY DARNELL WAFER,           )     Case No. CV 04-5694-AHS (AJW)
                                 )
          Petitioner,            )
                                 )
     v.                          )     REPORT AND RECOMMENDATION
                                 )     OF MAGISTRATE JUDGE
ANTHONY HEDGPETH, Warden,        )
                                 )
          Respondent.            )
_____)

## Background[1]

        During May, June and July 1998, defendant Wafer
committed a series of small business robberies (e.g.,
mini-marts, fast-food restaurants, a video store) in the San
Fernando Valley. He typically threatened the store cashier,
using a variety of weapons (including a crowbar, a knife, a

---

[1]   The following summary is taken from the opinion of the
California Court of Appeal.   Independent review of the record
confirms that the state appellate court's summary of the facts is
a fair and accurate one. The Ninth Circuit has accorded the factual
summary set forth in an opinion of the California Court of Appeal
a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).
See, e.g., Moses v. Payne, 555 F.3d 742, 746 n. 1 (9th Cir. 2009);
Slovik v. Yates, 556 F.3d 747, 749 n. 1 (9th Cir. 2009).

cup of hot coffee). Many of the robberies were videotaped by surveillance cameras and, after he was arrested, Wafer admitted many of the crimes. Most of the victims identified Wafer at trial. During one of the robberies, Wafer assaulted a cashier with a crowbar; he inflicted a serious head injury on the man, who died eight months later.

Wilson Kandanaarachichige worked at a Thrifty Gas Station in Northridge. On May 22, 1998, he was found lying on the floor behind the counter area. He had blood on his face and a laceration on top of his head. The following day, Dr. Rafael Quinonez, a neurological surgeon, operated on Kandanaarachichige, who had been admitted to the emergency room in critical condition with a comminuted skull fracture (which means a fracture with multiple fragments) and brain contusions. The skull fragments "were putting pressure on the brain cortex and ... there was one fragment that was cutting through the dura, which is a membrane that surround[s] the brain[,] and [was] actually cutting the brain cortex." Kandanaarachichige was put on anti-convulsant medication, which is intended to prevent the convulsions and seizures attendant to such an injury.

Dr. Tae-Soon Kim was director of the brain injury program at Casa Colina Rehabilitation Hospital. He did the entry evaluation when Kandanaarachichige was admitted to Casa Colina on June 17, 1998. There was no history of heart disease or seizure activity. Kim continued Kandanaarachichige on anti-convulsant medication because of the high incidence of seizures in patients suffering this

kind of head trauma. From July to September, Kandanaarachichige was free of seizures and Kim discontinued the seizure medication. But in October, Kandanaarachichige fell out of his bed and bit his tongue. Kim believed this incident was a seizure caused by "brain damage secondary to [the] assault," and he again prescribed a seizure medication. Kandanaarachichige had two seizures in November and another in January 1999. On January 28, 1999, Kandanaarachichige was found lying on his back in a bathtub. There was nothing to indicate he had suffered a slip and fall. He was taken to Pomona Valley Hospital Medical Center, where he was pronounced dead as a result of cardiac arrest. In Kim's opinion, all of Kandanaarachichige's seizures were due to the traumatic brain injury he suffered when Wafer assaulted him.

Jill Wilkerson, a clinical coordinator at Casa Colina, worked with Kandanaarachichige. She testified, "[t]here is an increased incidence of seizure disorder after a brain injury, particularly in the first year after [the] injury occurs. And it's a little higher in brain injuries that involve an open injury; in other words, where the skull or the skin is broken, as in [Kandanaarachichige's] case." Although some people have seizures that cannot be attributed to any particular cause, in her opinion Kandanaarachichige's seizures "were a result of his brain injury."

Dr. Hideo Itabashi, a specialist in neuropathology, conducted an autopsy on Kandanaarachichige's brain. For someone who had sustained this kind of traumatic brain

injury, "[i]t would be very likely that he would have a seizure secondary to the cortical injury ." "If there were no prior history of seizures and [the] person had trauma and ... [the brain lesion] that I found, it would be very likely that the person had [a] seizure on the basis of the trauma." Both seizures and heart disease can cause cardiac arrest. Asked to assume someone with Kandanaarachichige's head injury, who had no history of epilepsy, tumors or heart disease, Itabashi was asked: "This individual has a seizure, and the immediate cause of death is determined to be cardiac arrest. It is likely that but for that head injury he wouldn't have died of a heart attack?" Itabashi answered yes.

Deputy Medical Examiner Yulai Wang conducted the general autopsy on Kandanaarachichige's body. Based on that autopsy and on his review of Dr. Itabashi's findings, Wang concluded Kandanaarachichige's "[d]eath was caused by sequelae of blunt head injuries," meaning he had died as a consequence of the head injury. Wang also concluded the cardiac arrest Kandanaarachichige suffered had been caused by the head injury. Although Kandanaarachichige had mild coronary arteriosclerosis, he did not have "significant heart disease." His "coronary artery was mildly occluded and microscopically ... unremarkable." Wang was able to rule out a heart attack as the cause of death. Regarding the hospital notation that Kandanaarachichige had died of cardiac arrest, Wang testified: "Cardiac arrest, that's [a] description of basically his heart stopped. That's not specific. That

1  doesn't tell you why the heart stopped."

2  People v. Wafer, 2002 WL 203747, *1-2 (2002).

3      Petitioner was convicted of one count of first degree murder with

4  the special circumstance that the murder was committed in the course

5  of a robbery or attempted robbery, fourteen counts of second degree

6  robbery, and two counts of assault with a deadly weapon. [Clerk's

7  Transcript ("CT") 468-487].  Petitioner was sentenced to state prison

8  for a term of life without the possibility of parole plus twelve years

9  and eight months. [CT 499-511].

10      The California Court of Appeal affirmed petitioner's conviction.

11  [Lodged Doc. A8].  Petitioner did not file a petition for review in

12  the California Supreme Court.  Petitioner filed numerous habeas

13  petitions in the state courts, all of which were denied. [Lodged Docs.

14  B1-B2, C1-C2, D1-D2, E1-E2, F1-F2].

15                        **Petitioner's Contentions**

16      In this petition for a writ of habeas corpus, petitioner alleges

17  the following grounds for relief:

18      1.  Petitioner received ineffective assistance of counsel because

19  his counsel (a) failed to present expert testimony to rebut the

20  prosecution's assertion that petitioner was the proximate cause of Mr.

21  Kandanaarachichige's death; (b) failed to compile and articulate the

22  requisite information to make a prima facie showing of discrimination

23  in jury selection; and (c) failed to object to the unconstitutional

24  shackling of petitioner. [Petition at 6, 6(a)].

25      2.  The trial court erroneously denied petitioner's Faretta

26  motion, thereby depriving him of his Sixth and Fourteenth Amendment

27  rights. [Petition at 6(b)].

28      3.  Petitioner received ineffective assistance of appellate

counsel because his counsel (a) missed the deadline for filing a petition for review; (b) filed a habeas petition raising only a Faretta claim; and (c) failed to raise other claims. [Petition at 6(b)].

4. The prosecutor struck potential jurors on the basis of race in violation of the Fifth and Fourteenth Amendments. [Petition at 6(c)].

5. Petitioner was denied his rights to a fair trial and due process because he was shackled during the trial. [Petition at 6(c)].

### Procedural Default

Respondent argues that federal review of grounds one, three, four, and five is precluded by the doctrine of procedural default. [Amended Answer at 14-21].[2]

A federal court will not review the claims of a state prisoner when "(1) a state court has declined to address [those] claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120, 1127 (2011) (quoting Coleman v. Thompson, 501 U.S. 722, 729-730 (1991)); see also Cooper v. Neven, 641 F.3d 322, 327 (9th Cir. 2011).

Petitioner presented ground one (ineffective assistance of trial counsel), ground three (ineffective assistance of appellate counsel), ground four (striking potential jurors on the basis of race), and

---

[2] In the July 29, 2009 order requiring respondent to address the merits of the petition, this Court indicated that respondent's procedural argument appeared to lack merit. Subsequently, however, the Supreme Court decided Walker v. Martin, 131 S.Ct. 1120 (2011), which overturned Ninth Circuit precedent regarding the adequacy of California's timeliness rules for the purposes of procedural default.

ground five (improper shackling) in his habeas petitions filed in the California Supreme Court in case numbers S118672 and S121018. [Amended Answer, Exs. D & E].   The California Supreme Court denied both petitions with a citation to In re Clark, 5 Cal.4th 750 (1993) [Amended Answer, Exs. D & E], signifying that the petitions were untimely.[3]   See Lakey v. Hickman, 633 F.3d 782, 786 (9th Cir.) (explaining that a denial with a citation to In re Clark amounts to a denial of the petition as untimely), cert. denied, 131 S.Ct. 3039 (2011); Alvarez v. Wong, 425 Fed.Appx. 652, 652-653 (9th Cir.) ("The citation to Clark signals the court's conclusion that the petition was untimely."), cert. denied, 132 S.Ct. 255 (2011).   Further, the United States Supreme Court recently held that a California court's denial of a petition as untimely constitutes a procedural bar precluding federal court review.   Walker, 131 S.Ct. at 1128-1130 (holding that California's untimeliness bar for habeas petitions is an adequate and independent state procedural ground that precludes federal court review); see also Alvarez, 425 Fed.Appx. at 652-653 (applying Walker, upholding the district court's dismissal of a petition as procedurally barred after the California Supreme Court denied the claim citing In re Clark).   Therefore, absent a showing of cause for the default and

---

[3]   The Ninth Circuit so found in its order remanding the case to this Court. [See Docket Number 40 (Memorandum, stating "The California Supreme Court's citation to In re Clark, 855 P.2d 729 (Cal. 1993) (in bank), reflected the intention to dismiss Wafer's second and third state habeas petitions as untimely.")].   The Ninth Circuit's determination is the law of the case, and this Court is bound by it.   See Garamendi v. Altus Finance S.A., 282 F.R.D. 270, 273 (C.D.Cal. 2012) (discussing the law of the case doctrine as well as the "mandate rule," pursuant to which "district courts are not free to decide issues on remand that were previously decided either expressly or by necessary implication on appeal.") (citations omitted).

actual prejudice resulting from the alleged constitutional violation, federal review of these claims is barred. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Cause for a procedural default exists where something external to the petitioner impeded his efforts to comply with the state's procedural rule. Coleman, 501 U.S. at 753. Negligence on the part of a prisoner's post-conviction attorney does not qualify as "cause" because a prisoner is not entitled to post-conviction counsel at all. Maples v. Thomas, 565 U.S. ___, 132 S.Ct. 912, 922 (2012) (citing Coleman, 501 U.S. at 753).[4] Thus, when a petitioner's post-conviction attorney misses a filing deadline or fails to raise allegedly meritorious claims, the petitioner is bound by the oversight and cannot rely on it to establish cause. Maples, 132 S.Ct. at 922 (citing Coleman, 501 U.S. at 753-754).

Petitioner argues that his default was excused because it was the result of appellate counsel's failure to file a petition for review in the California Supreme Court. [Traverse at 5-7]. Petitioner, however, had no right to counsel in either a petition for review or in collateral proceedings, so counsel's failure to timely file a petition for review or to raise certain claims in a habeas petition do not amount to cause for petitioner's default. See Graves v. Swarthout, 471 Fed.Appx. 768, 772 (9th Cir. 2012) (finding alleged ineffective assistance of counsel in failing to raise claims in a petition for

---

[4]  This rule is based upon "well-settled priniples of agency law" under which the principal bears the risk of negligent conduct on the part of his agent. Coleman, 501 U.S. at 753-754. Accordingly, there is an exception to the rule in cases where an attorney abandons the client, thereby severing the principal-agent relationship, but that exception does not apply here. See Maples, 132 S.Ct. at 922-923.

review in the California Supreme Court did not amount to cause justifying a procedural default) (citing <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987), <u>Ross v. Moffitt</u>, 417 U.S. 600, 610 (1974), and <u>Murray v. Carrier</u>, 477 U.S. 478, 486-488 (1986)); <u>Ellis v. Armenakis</u>, 222 F.3d 627, 632-633 (9th Cir. 2000) (there is no right to counsel on discretionary review, so ineffective assistance of counsel in any proceeding other than the first appeal of right cannot establish cause for procedural default).

The Supreme Court has qualified <u>Coleman</u> by "recognizing a narrow exception: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." <u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 1319 (2012). However, this Court is barred from considering an ineffective assistance of counsel claim as "cause" for the procedural default of another claim when the ineffective assistance of counsel claim itself has been procedurally defaulted. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 450-453 (2000) (holding that a petitioner's procedurally defaulted ineffective assistance of appellate counsel claim can serve as cause to excuse the procedural default of other claims only if he can satisfy the cause and prejudice standard with respect to that claim as well). As discussed, the California Supreme Court rejected petitioner's ineffective assistance of appellate counsel claim as untimely. [Amended Answer, Ex. E]. Petitioner has not alleged any facts suggesting cause for his default of his ineffective assistance of appellate counsel claim. As a result, this procedurally defaulted claim cannot constitute cause for petitioner's default of his underlying ineffective assistance of counsel claim.

1   Apart from his conclusory allegation blaming his procedural

2   default on his counsel, which is irrelevant, petitioner has not

3   identified any external impediment that prevented him from filing a

4   timely petition in the state court raising claims one, three, four and

5   five.[5]  Accordingly, he has not shown cause for his default, and the

6   Court declines to consider the merits of these four claims for relief.

7   Petitioner presented ground two (challenging the denial of his

8   request for self-representation) in a petition filed in the California

9   Supreme Court in case number S110852. [Amended Answer, Ex. C].  That

10   petition was denied with citation to In re Waltreus, 62 Cal.2d 218

11   (1965) [Amended Answer, Ex., C].

12   Contrary to respondent's argument [see Amended Answer at 20-21],

13   a citation to In re Waltreus is "neither a ruling on the merits nor a

14   denial on procedural grounds and, therefore, has no bearing on a

15   California prisoner's ability to raise a federal constitutional claim

16   in federal court." Hill v. Roe, 321 F.3d 787, 789 (9th Cir. 2002)

17   (citing Ylst v. Nunnemaker, 501 U.S. 797, 805 706 (1991))); see

18   Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996) (same).

19   Accordingly, this Court considers the merits of ground two below.

20                              **Standard of review**

21   A federal court may not grant a writ of habeas corpus on behalf

22   of a person in state custody

23

24   [5]  A procedural default also may be excused when the failure to
25   consider the petitioner's claims will result in a fundamental
     miscarriage of justice.  Edwards, 529 U.S. at 451.   To establish
26   a "fundamental miscarriage of justice," petitioner must show that
     "a constitutional violation has probably resulted in the conviction
27   of one who is actually innocent." Schlup v. Delo, 513 U.S. 298,
     327 (1995) (internal quotation marks omitted).  Petitioner has not
28   even attempted to make this extraordinarily difficult showing.

1    with respect to any claim that was adjudicated on the merits
2    in state court proceedings unless the adjudication of the
3    claim (1) resulted in a decision that was contrary to, or
4    involved an unreasonable application of, clearly established
5    Federal law, as determined by the Supreme Court of the
6    United States; or (2) resulted in a decision that was based
7    on an unreasonable determination of the facts in light of
8    the evidence presented in the state court proceeding.
9    28 U.S.C. § 2254(d); see Williams v. Taylor, 529 U.S. 362, 412 (2000).
10       As used in Section 2254(d), the phrase "clearly established
11   federal law" means "holdings of the Supreme Court at the time of the
12   state court decision." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.
13   2011) (citing Williams, 529 U.S. at 412). Although only Supreme Court
14   law is binding, "circuit court precedent may be persuasive in
15   determining what law is clearly established and whether a state court
16   applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting
17   Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

18       Under section 2254(d)(1), a state court's determination that a
19   claim lacks merit precludes federal habeas relief so long as
20   "fairminded jurists could disagree" about the correctness of the state
21   court's decision. Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770,
22   786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).
23   This is true even where a state court's decision is unaccompanied by
24   an explanation.  In such cases, the petitioner must show that "there
25   was no reasonable basis for the state court to deny relief." Richter,
26   131 S.Ct. at 784.

27       Relief is warranted under section 2254(d)(2), only when a state
28   court decision based on a factual determination is "objectively

11

1  unreasonable in light of the evidence presented in the state-court

2  proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384

3  F.3d 628, 638 (9th Cir. 2004), cert. denied, 545 U.S. 1165 (2005)).

4      Finally, state court findings of fact are presumed to be correct

5  unless petitioner rebuts that presumption by clear and convincing

6  evidence.  28 U.S.C. § 2254(e)(1).

7                              **Discussion**

8      In ground two of the petition, petitioner alleges that he was

9  denied his Sixth and Fourteenth Amendment rights by the trial court's

10 erroneous denial of his requests to represent himself. [Petition at

11 6(b)].  The facts relevant to his claim are as follows.

12     On June 15, 1999, petitioner announced in open court: "I don't

13 want Mr. Kuperberg [the deputy public defender] to represent me any

14 further." [Reporter's Transcript on Appeal ("RT") A1].  With the

15 prosecutor absent, petitioner complained to the trial court that

16 Kuperberg had not shown him certain documents regarding discovery and

17 had failed to visit him in jail.  [RT A3-A4].  In response, Kuperberg

18 explained that he and petitioner had disagreed "on [the] strategy of

19 this case from the beginning," that he had visited petitioner twice at

20 county jail, and that his office had a policy of not giving discovery

21 documents to clients who were incarcerated in order to prevent guards

22 and prison snitches from gaining access to the material. [RT A5].

23 Kuperberg said that when went to the jail to share discovery

24 information with petitioner, they got into an argument and petitioner

25 walked away. After the preliminary hearing, however, petitioner seemed

26 very happy with Kuperberg because Kuperberg managed to achieve

27 dismissal of the most serious charge at that time - namely, attempted

28

murder.[6] [RT A6].  Kuperberg conceded there had been one period of time
when all of his attention was focused on a trial in a murder case. "I
have never indicated that Mr. Wafer's case was not a priority. But I
do believe that there was a time period when I was in the middle of
the Ellis murder trial when I indicated that I would not be able to
visit at all during the trial, that when I'm in trial with anybody,
that is the highest priority and no other case has a bigger priority
as the case that I'm in trial on." [RT A6-A7].  Kuperberg also said:
"I have not visited Mr. Wafer recently for a number of reasons. One
was the last time I did go up there he walked out on me.  And
secondly, there's not a whole lot new to tell him at this point. [¶]
The preliminary hearing was exhaustive and there's no new information
from the preliminary hearing, and I've been waiting for the last
number of months for the People to give me discovery on the new murder
charges, specifically the autopsy report. I just received that ...
approximately two weeks ago." Kuperberg also said that petitioner had
made previous motions to substitute counsel. [RT A7].

     After further discussion, the trial court informed petitioner
that there was no legal reason to remove Kuperberg as counsel.  It
further informed petitioner that he had a right to represent himself,
but that it would be foolhardy to do so. [RT A13].  Petitioner
interrupted, saying, "I don't want him, sir, and I refuse to proceed
on any further with him." [RT A13].  Petitioner then said: "I would
like to invoke my Faretta rights. I want to go pro per.  I do not want
this gentleman to proceed any further as my counsel." [RT A14].

---

[6]   After the preliminary hearing, the victim of the attempted
murder charge passed away. [RT A6].

13

1  The trial court asked petitioner if he was choosing
2  self-representation "simply because I won't remove Mr. Kuperberg or do
3  you really want to go pro per?" Petitioner replied, "I don't want to
4  go pro per. I want someone that's able to handle my case. Someone
5  that's going to give me professional advice. Someone that's going to
6  talk to me in a professional manner. Someone that's going to be there,
7  present. [¶] I'm not expecting him to be there 24/7. I understand he
8  has a lot of work, ... [b]ut when I'm there, when my family or - you
9  know, we're asking questions, ... we expect the response from him. We
10 expect certain things from him that we haven't got thus far." [RT A14-
11 A15].

12     Petitioner continued complaining about Kuperberg's conduct and
13 said that he wanted to be represented by someone who had more time to
14 devote to the case. The trial court explained why certain trial
15 tactics might have been pursued, and suggested that petitioner and
16 Kuperberg were merely having communication problems. After the trial
17 court urged petitioner to try to work things out with Kuperberg, the
18 following colloquy occurred:

19     [Petitioner]: No disrespect, sir, but I refuse to go any
20     further with this gentleman.
21     [The Court]: Well, you are going to go with him.
22     [Petitioner]: I would like to invoke my <u>Faretta</u> rights and
23     go pro per.
24     [The Court]: We're right back to what I said again. You are
25     not really wanting to represent yourself, you want him off
26     and that's not a good ground to represent yourself. There's
27     two separate rights.
28 [RT A16].

After some further comments by Kuperberg, the trial court reiterated its denial of petitioner's _Faretta_ motion, saying: "And as far as your _Faretta_ issue, I'm going to make a finding that it's really a conditional request that you tried to invoke." [RT A18]. After the trial court implored petitioner to try to work with his counsel and advised him that the court system is attentive to assure that attorneys do their job, petitioner said, "All right, sir, I trust you." At that time, petitioner did not renew his request to represent himself. [RT A19].

Nothing more happened until October 26, 2000, the first day of trial, when petitioner again complained about Kuperberg's failure to devote enough attention to the case and his failure to provide petitioner with documents from the case file, a charge which Kuperberg denied. [RT 4-7]. Petitioner said that he would "like to go pro per because I have support of my family and other people that are helping me, pursuing the interests of my case. I don't feel Mr. Kuperberg has my best interest at heart. ... So I'm basically asking the court's help to either provide me with a state appointee or different attorney, or even right now to go pro per." [RT 3-6].

The trial court denied the request, stating:

Well, here is the problem. You're really making two different things. One, you want me to get rid of Mr. Kuperberg, at least from this case, and then you want another attorney, and then you want to represent yourself. ... [But] you really haven't given me any reason to get rid of Mr. Kuperberg. I know you've had disagreements. ... So there is no reason for me to replace Mr. Kuperberg. [¶] Now, if you want to represent yourself, we have to talk in a

1     different frame of mind. [¶] Are you ready to go to trial

2     now?

3  [RT 15-17].  After petitioner replied, "No, sir, I'm not. I need some

4  time," the trial court ruled:

5     We are all ready to go.  And you know if you are ready to

6     represent yourself starting right now and go to trial right

7     now, that's one thing, you can certainly represent yourself.

8     But if you are telling me that you need, you know, more

9     time, I'm going to have to say no, because we have to keep

10     some limits on this stuff.

11  [RT 16-17].

12     The Constitution guarantees a criminal defendant the right to

13  self-representation at trial.  Faretta v. California, 422 U.S. 806,

14  819-820 (1975). Under clearly established Supreme Court precedent,

15  invocation of the right must be timely and unequivocal. Faretta, 422

16  U.S. at 834; see United States v. Mendez-Sanchez, 563 F.3d 935, 945

17  (9th Cir. 2009) ("Because the exercise of self-representation cuts off

18  the exercise of the right to counsel, often to individual detriment,

19  we recognize the right only when it is asserted without

20  equivocation."), cert. denied, 130 S.Ct. 252 (2009).

21     The California Court of Appeal rejected petitioner's claim.  As

22  to petitioner's first request for self-representation, it concluded

23  that the denial was proper because petitioner's request was not

24  unequivocal.  The state appellate court noted that it should draw

25  every reasonable inference against a waiver of the right to counsel

26  and that conduct or words reflecting ambivalence about self-

27  representation support denial of such a motion.  It also noted that a

28  motion for self-representation "made in passing anger or frustration,

or an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." [Amended Answer, Ex. A at  31-32 (citation omitted)].   The state appellate court examined the entire record and found that it appeared that petitioner had invoked <u>Faretta</u> only in response to the trial court's denial of his motion for substitute counsel, and "not because he truly wanted to represent himself." [Amended Answer, Ex. A at 32].

The state appellate court also rejected petitioner's argument that his request was unequivocal but conditional.   The court recognized that a <u>Faretta</u> request may be unequivocal even if it is conditional. [Amended Answer, Ex. A at 32-33 (discussing <u>United States v. Hernandez</u>, 203 F.3d 614, 617, 621-622 (9th Cir. 2000) (finding that a request was unequivocal where the defendant said, "Well, I mean, if you can't change him [appointed counsel], I'd like to represent myself, with an interpreter" and where the record demonstrated that the trial court considered the statement to be a request for self-representation and inquired further, but eventually denied the request because the defendant did not know enough about the legal issues in the case)].   Although the trial court in petitioner's case used the word "conditional" in denying petitioner's request, the state appellate court determined that it did not use the word in the same sense as the Ninth Circuit used it in <u>Hernandez</u>. [Amended Answer, Ex. A at 33].

The state court's rejection of petitioner's claim was not contrary to clearly established federal law.   As set forth above, in the course of his colloquy with the trial court during the first <u>Faretta</u> request, petitioner's primary complaint was about Kuperberg's performance, and his primary objective was to obtain appointment of a

different attorney.  His request to represent himself appeared to have been made in frustration when the motion for substitute counsel was denied, and the trial court clearly viewed it as such.  In fact, when the trial court asked him is he was seeking to go pro per "simply because I won't remove Mr. Kuperberg or do you really want to go pro per," petitioner replied, "I don't want to go pro per.  I want someone that's able to handle my case." [RT A14-A16].  Considering the entire record, the state court's conclusion that petitioner's request to represent himself was equivocal was not an unreasonable one.  See Mendez-Sanchez, 563 F.3d at 939 (holding that while a defendant may invoke his self-representation right after a denial of his motion to substitute counsel, the invocation must be equivocal, and a "request to represent oneself made while at the same time stating a preference for representation by a different lawyer and rearguing the change of counsel motion is insufficient to invoke Faretta"); Stenson v. Lambert, 504 F.3d 873, 882-883 (9th Cir. 2007)(holding that state court must evaluate record as a whole to determine whether a request for self-representation is equivocal and stating "[a] clear preference for receiving new counsel over representing oneself ... may ... be an indication that the request, in light of the record as whole, is equivocal."), cert. denied, 555 U.S. 908(2008); Jackson v. Ylst, 921 F.2d 882, 889 (9th Cir. 1990) (finding that the defendant's request to represent himself was equivocal because it was an impulsive response to the trial court's denial of his motion for substitute counsel).

   With regard to petitioner's second Faretta motion, made on the morning of the day trial was set to begin, the California Court of Appeal determined that it was properly denied as untimely. [Amended Answer, Ex. A at 33].

1  As the Ninth Circuit has explained, <u>Faretta</u> "does not articulate

2  a specific time frame pursuant to which a claim for

3  self-representation qualifies as timely." <u>Stenson</u>, 504 F.3d at

4  884-885. Instead, <u>Faretta</u> indicates only that a motion for

5  self-representation made "weeks before trial" is timely. <u>Faretta</u>, 422

6  U.S. at 835. Consequently, a state court's denial of a motion for

7  self-representation as untimely is not an objectively unreasonable

8  application of <u>Faretta</u> where the request was made on the morning of

9  the first day of trial. <u>Marshall v. Taylor</u>, 395 F.3d 1058, 1061 (9th

10 Cir.), <u>cert. denied</u>, 546 U.S. 860 (2005); <u>see also</u> <u>Stenson</u>, 504 F.3d

11 at 879, 884-885 (not an unreasonable application of <u>Faretta</u> to deny

12 request for self-representation as untimely when it was made on the

13 day before voir dire ended and on the verge of jury empanelment). In

14 light of the Ninth Circuit's decisions in <u>Stenson</u> and <u>Marshall</u>, the

15 state court's denial of petitioner's <u>Faretta</u> request made on the day

16 \\

17 trial was set to begin was neither contrary to, nor an unreasonable

18 application of, clearly established Supreme Court precedent.

19 **Conclusion**

20  It is recommended that judgment be entered denying the petition.

21

22 Dated: December 4, 2012

23

24 _____
   Andrew J. Wistrich
   United States Magistrate Judge

25

26

27

28

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12  ANTHONY DARNELL WAFER,        )     Case No. CV 04-5694-AHS (AJW)
                                  )
13            Petitioner,         )
                                  )
14      v.                        )     [PROPOSED]
                                  )     JUDGMENT
15  ANTHONY HEDGPETH, Warden,     )
                                  )
16            Respondent.         )
    _____)

17

18      It is hereby adjudged that the petition for a writ of habeas

19  corpus is denied.

20

21  Dated: _____

22

23                              _____
                                Alicemarie H. Stotler
24                              United States District Judge

25

26

27

28